STATE of Utah, in the Interest of
D.S.K. and C.R.K. persons under
eighteen years of age.

Bill R. KASPER, Plaintiff
and Appellee,

v.

Sandra L. KASPER, Defendant
and Appellant.

No. 890025–CA.

Court of Appeals of Utah.

April 25, 1990.

Don R. Petersen and Leslie W. Slaugh, Provo, for defendant and appellant.

Wayne B. Watson, Provo, for plaintiff and appellee.

Before BENCH, BILLINGS and GREENWOOD, JJ.

## OPINION

GREENWOOD, Judge:

Defendant appeals an order awarding custody of her minor children to plaintiff, their natural father, following a finding of neglect. We conclude that the Utah juvenile court did not have jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA), Utah Code Ann. § 78–45c–1 to –25 (1987) or the federal Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C.A. § 1738A (West Supp.1989). We accordingly reverse.

## FACTS

Plaintiff Bill R. Kasper (father) and defendant Sandra L. Kasper (mother) were married in California in 1967 and divorced in Florida in 1987. While the divorce proceedings were pending in Florida, mother moved with the parties' four children to Utah. On February 26, 1988, a stipulated final judgment of dissolution of marriage was entered by the Ninth Judicial Circuit Court of Orange County, Florida. Mother was given physical custody of the parties' children, and father was to "share parenting" with her and was afforded visitation.

On March 8, 1988, approximately two weeks after entry of the stipulated final judgment, father, still a resident of Florida, filed a petition in the Fourth District Court of Utah to modify the decree of divorce with respect to child custody and support. Father claimed that in the eighteen months during which mother had physical custody of the children in Utah, there had been a substantial and material change in the circumstances of the parties. According to the affidavit accompanying the petition, mother was allegedly cohabitating with a man accused of sexual abuse of a child. Father further alleged that the children were being neglected and that mother was planning to move to California with the children. At the same time, father filed four petitions in the Fourth District Juvenile Court of Utah, separately alleging that each of the minor children had been neglected.[1] Father moved for, and was granted, an ex parte temporary order restraining mother from leaving Utah.

Mother moved to dismiss the modification petition and defer jurisdiction to Florida on the basis of Utah Code Ann. § 78–45c–14 (1987). Alternatively, she moved to have the petition certified to the juvenile court and consolidated with the neglect proceedings. She also sought to quash the ex parte restraining order, claiming that she had intended to move to San Diego, California, for some time, and that

the order had been served after she had completed preparations to depart. Mother moved to California despite the order, taking the children with her.

 The district court granted mother's motion to certify the petition to modify custody to the juvenile court.[2] After a hearing, the juvenile court denied mother's motion to dismiss for lack of jurisdiction, finding that the children had lived in Utah more than a year and that the allegations of neglect "concerned matters that occurred" in this state.

Father then moved for an ex parte order seeking temporary custody of the minor children and alleged that mother had secreted the children in the San Diego area. Mother had, in fact, filed a petition in the California Superior Court to modify the Florida divorce judgment, alleging that father had sexually abused the children and requesting that his visitation rights be suspended. The California Superior Court declined to exercise jurisdiction, finding that Florida had continuing jurisdiction to modify the divorce decree. The Utah juvenile court granted father temporary custody of the children pending a hearing scheduled for August 25, 1988.

Just prior to the August hearing, mother filed another motion to dismiss, asserting certain circumstances had changed since the ruling on the first motion. She also asserted that she had filed a petition with the Florida court to modify the divorce decree and that the Florida court was exercising jurisdiction over the matter.

At the August 25 hearing, juvenile court Judge Hermansen informed the parties that he had communicated by telephone with Judge Kaney of the Florida court the day before, regarding jurisdiction and the allegations of abuse or neglect in Utah. Judge Hermansen stated that he and Judge Kaney did not have any disagreement regarding his assuming jurisdiction and holding a hearing. They agreed that it would

---

**1.** Two of the children, M.W.K. and S.S.K., turned eighteen years of age during the pendency of these proceedings.

**2.** Utah's juvenile courts have exclusive original jurisdiction in proceedings involving neglected or dependent children. *See* Utah Code Ann. § 78–3a–16(1)(c)(i) (Supp.1989).

be improper for the matter to go forward in two states and they would work that out by conversing again after the hearing. Judge Hermansen also told counsel that a temporary order might issue from his court and then the matter would likely be deferred to Florida. He further stated that he would not drop everything until litigation was completed in Utah and that determining whether the matter would be referred to Florida was up to him and Judge Kaney.

At the August 25, 1988 hearing, several individuals, including father, but not mother, testified. Judge Hermansen interviewed the two youngest children in chambers and ordered that temporary custody remain with father. Judge Hermansen also scheduled trial on the petitions for October 21, 1988.

On October 12, 1988, Judge Kaney sent Judge Hermansen a letter and order of transfer that he had prepared for Judge Hermansen to sign. Judge Kaney's letter stated that the order "relinquishes jurisdiction to my court." The letter also informed Judge Hermansen that Judge Kaney had held a temporary hearing, and, as a result, had left the children in the custody of father.

The order included the Utah court captions for both the custody petition and the neglect petitions. The order stated that the parties' marriage was dissolved in Florida where the issue of child custody was addressed; that at the time these proceedings were filed in Utah, husband was a resident of Orange County, Florida; that there were on-going proceedings in Florida; that Judge Kaney had accepted jurisdiction of the parties pursuant to the UCCJA; and that neither the parties nor the minor children currently resided in Utah. Based on these findings, the juvenile court ordered the following:

1. That this Court relinquishes jurisdiction of the above-captioned proceedings to the Ninth Judicial Circuit Court in and for Orange County, Florida.

2. That this Court no longer will exercise jurisdiction over the subject matter, the parties or the children of the parties and all matters are concluded in this case.

On October 14, 1988, the juvenile court issued a notice rescheduling the trial to November 21, 1988.

On October 18, 1988, Judge Hermansen signed the order of transfer. The order was sent to Judge Kaney accompanied by a letter in which Judge Hermansen wrote that he was "troubled" about the case in view of father's petitions alleging abuse of the children. Judge Hermansen stated:

I feel that if they demand a trial on this matter I must hold the trial and make Findings. The only thing that I can think would be possible or appropriate thereafter would be to send the Findings from our trial to you for your information. It would seem to me that you would be interested if we found there was some substance to the allegations of abuse....

The next thing that would be of concern, of course, would be the custody of the children if they have been neglected and we have now turned that matter over to you. I feel obligated to try any matter that is at issue where the allegations concern events that happened in this jurisdiction.

On November 14, 1988, Judge Hermansen advised both parties by telephone that the trial set for November 21, 1988, would proceed as scheduled. On November 18, 1988, mother filed a motion to dismiss on grounds that the court had already entered an order transferring all proceedings to the Florida court. Alternatively, she contended that by relying on the order of transfer, she had assumed that all proceedings before the juvenile court were terminated and, therefore, did not have time to prepare for trial.

Mother's motion was heard before the court on November 21, 1988, and denied. Judge Hermansen advised the parties that his intent was not to transfer jurisdiction of the dependency and neglect petitions to the Florida court. Counsel for mother then excused himself from the proceedings. Later in the trial, Judge Hermansen told counsel for father that

[s]ince there were—there was—I heard absolutely no indication that they were going to take it up in Florida, when you asked for a trial here, I granted it. And ... that's my understanding pursuant to my letter, and handling it that way, Mr. Watson, I don't think there's really anything to be gained by my calling him on the phone....

Trial continued and the juvenile court heard numerous witnesses and made findings of fact and conclusions of law. In its order, the juvenile court stated that it had relinquished jurisdiction of the divorce modification proceeding, but had not relinquished jurisdiction over the petition alleging neglect of the children. The juvenile court made findings that mother cohabitated with a man who was accused of sexual abuse of a minor; mother and the man with whom she lived watched pornographic video tapes in the presence of the children; mother and her friend went to California for approximately two weeks and left the children home without adequate fuel, heat, or food; the man occasionally beat the children; mother had locked the children out of the home; the children were absent from school for substantial periods of time and were performing poorly academically; mother neglected the physical needs of the children by failing to provide appropriate supervision, meals and clothing; and mother fabricated stories about father sexually abusing the children. The juvenile court determined that the minor children were neglected and dependent and pursuant to Utah Code Ann. § 78–3a–39(2) (1987),[3] awarded custody of the children to father.

Mother brought this appeal arguing that jurisdiction over the entire case was properly in the Florida courts under the requirements of both the UCCJA and PKPA. Alternatively, she argues that the juvenile court's order clearly relinquished jurisdiction, and that the court abused its discretion by taking further action in the case.

She also claims that the court's failure to grant her a continuance and its entry of several ex parte orders on the basis of information and belief constituted error.

## STANDARD OF REVIEW

■ Mother challenges the propriety of the juvenile court's subject matter jurisdiction, i.e., the authority and competency of the court to decide the case. Since her claim is a question of law, *see Dragoo v. Dragoo*, 99 Wis.2d 42, 298 N.W.2d 231, 232 (1980) (a determination of subject matter jurisdiction under the UCCJA is a question of law), we review it under a correction of error standard, giving no deference to the trial court. *Bountiful v. Riley*, 784 P.2d 1174 (Utah 1989); *Western Kane County Spec. Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376, 1378 (Utah 1987).

## UCCJA

■ The UCCJA was promulgated to avoid jurisdictional competition and conflict, promote interstate cooperation, litigate custody where the child and family have the closest connections and where significant evidence concerning the child is most readily available, discourage continuing conflict over custody, deter abductions and unilateral removals of children, avoid relitigation of another state's custody rulings, and promote the exchange of information and mutual assistance between different states. Utah Code Ann. § 78–45c–1 (1987).[4] In determining whether Utah courts have jurisdiction, "it is crucial that each of the multi-faceted components of the Act be construed to promote its general purposes." *Stuart v. Stuart*, 516 So.2d 1277, 1279 (La.Ct.App.1987).

By claiming it retained jurisdiction over the neglect allegations, the juvenile court granted permanent custody to father and thereby clearly modified the custody decree entered in Florida. Consistent with its

---

**3.** Section 78–3a–39(2) empowers the juvenile court to "place the child in the legal custody of a relative or other suitable person, with or without probation or protective supervision, provided that the juvenile court shall not assume the function of developing foster home services."

**4.** All fifty states and the District of Columbia have adopted the UCCJA. 9 U.L.A. 115–116 (1988).

goal of avoiding "relitigation of custody decisions of other states in this state insofar as feasible," section 78–45c–1(f), the UCCJA commands in Utah Code Ann. § 78–45c–13 (1987) that the courts of this state shall recognize and enforce "an initial or modification decree of a court of another state which had assumed jurisdiction" under the terms of the act. The next following section, Utah Code Ann. § 78–45c–14(1) (1987), sets forth bases for jurisdiction to modify an existing out-of-state custody decree. The section provides:

(1) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this act or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction.

Professor Bodenheimer, reporter for the special committee which drafted the Uniform Act, stated regarding section 14(1) of the UCCJA (section 78–45c–14(1)):

[T]he continuing jurisdiction of the prior court is exclusive. Other states do not have jurisdiction to modify the decree. They must respect and defer to the prior state's continuing jurisdiction. Section 14 is the key provision which carries out the Act's two objectives of (1) preventing the harm done to children by shifting them from state to state to relitigate custody, and (2) preventing jurisdictional conflict between the states after a custody decree has been rendered. . . .

Exclusive continuing jurisdiction is not affected by the child's residence in another state for six months or more. Although the new state becomes the child's home state, significant connection jurisdiction continues in the state of the prior decree where the court record and other evidence exists and where one parent or another contestant continues to reside. *Only when the child and all parties have moved away is deference to another state's continuing jurisdiction no longer required.*

Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA*, 14 Fam.L.Q. 203, 214–15 (1981) (quoted in *Kumar v. Superior Court*, 32 Cal.3d 689, 696, 652 P.2d 1003, 1007, 186 Cal.Rptr. 772, 776 (1982) (emphasis added)).

Professor Bodenheimer illustrates her point by the following example:

A typical example is the case of the couple who are divorced in state A, their matrimonial home state, and whose children are awarded to the wife, subject to visitation rights of the husband. Wife and children move to state B, with or without permission of the court to remove the children. State A has continuing jurisdiction and the courts in state B may not hear the wife's petition to make her the sole custodian, eliminate visitation rights, or make any other modification of the decree, even though state B has in the meantime become the "home state" under section 3. *The jurisdiction of state A continues and is exclusive as long as the husband lives in state A unless he loses contact with the children, for example, by not using his visitation privileges for three years.*

Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws*, 22 Vand.L.Rev. 1207, 1237 (1969) (quoted in *Rawlings v. Weiner*, 752 P.2d 1327, 1331 (Utah Ct.App.1988) (Bench, J., concurring) (emphasis added), *cert. denied*, 765 P.2d 1278 (Utah 1988).

Thus, in accord with the purpose of section 78–45c–14 "to achieve greater stability of custody arrangements and avoid forum shopping," UCCJA § 14, 9 U.L.A. comment 292 (1988), *all* petitions for modification of custody decrees must be addressed by the state which rendered the original decree if that state had and retains jurisdiction under the standards of the UCCJA. As long as the decree state retains jurisdiction there is no concurrent jurisdiction to modify a decree under the UCCJA. *See Levinson Through Levinson v. Levinson*, 354 Pa.Super. 407, 512 A.2d 14, 17 (1986). *See also* Bodenheimer, *In-*

terstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA, 14 Fam.L.Q. 203, 216–19 (1981) (discussing the myth of concurrent modification jurisdiction). Section 78–45c–14 is unambiguous: if the state of the original decree has jurisdiction, a court of another state "shall not modify that decree." *Id.*

Although some confusion exists among courts that have addressed modification of out-of-state custody decree cases, the majority of courts now follow Bodenheimer's explication and have held that jurisdiction remains in the decree state as long as one parent continues to reside in the original state and maintains some contact with the child such as exercising visitation rights. *See, e.g., Kumar,* 32 Cal.3d at 700, 652 P.2d at 1010, 186 Cal.Rptr. at 779; *Hamill v. Bower,* 487 So.2d 345, 347–48 (Fla.Dist. Ct.App.1986); *Funk v. Macaulay,* 457 N.E.2d 223, 227 (Ind.Ct.App.1983); *In re Marriage of Leyda,* 398 N.W.2d 815, 819 (Iowa 1987); *Harris v. Melnick,* 314 Md. 539, 552 A.2d 38, 45–46 (1989); *Clarke v. Clarke,* 126 N.H. 753, 758, 496 A.2d 361, 364–65 (1985); *G.S. v. Ewing,* 786 P.2d 65, 69–70 (Okl.1990); *Tennessee ex rel. Cooper v. Hamilton,* 688 S.W.2d 821, 825 (Tenn. 1985).

■■■ The first question we address, therefore, is whether Florida, the decree state, continued to have jurisdiction under the "jurisdictional prerequisites" of the UCCJA. *Quenzer v. Quenzer,* 653 P.2d 295, 303–04 (Wyo.1982); *see also, e.g., Ku-*

mar, 32 Cal.3d at 696, 652 P.2d at 1007, 186 Cal.Rptr. at 776; *Harris,* 552 A.2d at 44; *Clarke,* 496 A.2d at 364; *G.S.,* 786 P.2d at 71. The juvenile court in these proceedings never addressed this question. Father diverted the analysis by first asserting that Utah had jurisdiction under Utah Code Ann. § 78–45c–3 (1987).[5] He argued that since Utah is the "home state" (section 78–45c–3(1)(a))[6] and had a closer connection with the children than Florida because the evidence regarding the neglect allegations and the witnesses involved were in Utah (section 78–45c–3(1)(b)), the juvenile court appropriately exercised jurisdiction under section 78–45c–3. Father also justified the juvenile court's exercise of jurisdiction by arguing that Utah is a more convenient forum based on the factors enumerated in Utah Code Ann. § 78–45c–7(3) (1987).

■■■ Based upon the principles we have outlined, father's arguments are without merit. First, UCCJA modification jurisdiction does not automatically shift to the new "home state." Second, although initial jurisdiction is primarily in the state with the closest connections to the child and to information about his or her present and future well-being, jurisdiction to modify an existing custody decree is reserved for the state that rendered the decree. Finally, where Florida has continuing jurisdiction, Florida, not Utah, must decide whether to relinquish jurisdiction to Utah or any other state on grounds of *forum non conveniens*. *See, e.g., Trent v. Trent,*

---

**5.** Section 78–45c–3(1) provides that a court has jurisdiction to make child custody determinations by initial or modification decree if any of the following conditions are met:

(a) This state ... is the home state of the child at the time of commencement of the proceeding ...;

(b) It is in the best interest of the child that a court of this state assume jurisdiction because ... the child and at least one contestant, have significant connection with this state, and ... there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(c) The child is physically present in this state and ... it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or

abuse or is otherwise neglected or dependent; or

(d) ... another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and ... it is in the best interest of the child that this court assume jurisdiction.

**6.** "Home state" is the state in which the child has lived with a parent for at least six months immediately preceding the time involved. Utah Code Ann. § 78–45c–2(5) (1987). Although mother had removed herself and the children from Utah by the time of trial, the circumstances to be considered were those in existence at the time the petitions were filed. *See State ex rel. W.D. v. Drake,* 770 P.2d 1011, 1013 n. 2 (Utah Ct.App.1989).

735 P.2d 382, 383 (Utah 1987) (regarding visitation rights).

■ After assuming that Utah had jurisdiction, father, without elaboration, asserts that Florida failed to meet the jurisdictional prerequisites in section 78–45c–3. We disagree. Because father continued to reside in Florida, the decree state, we find that Florida had continuing and exclusive jurisdiction over the custody decree despite whatever connections the parties may have had with Utah.[7] Further, since father petitioned the Utah courts for modification of the custody decree only two weeks after the final decree was entered in Florida, it is apparent that, at that point in time, Florida maintained sufficient contacts with the children.[8] To summarize, if the decree state has continuing jurisdiction under section 78–45c–14, that exclusive jurisdiction cannot be vitiated by another state's unilateral utilization of section 78–45c–3 ("home state") or section 78–45c–7(3) (*"forum non conveniens"*).

■ Having decided that Florida had exclusive continuing jurisdiction to modify its decree, we now turn to the next condition in section 78–45c–14 which could possibly give Utah jurisdiction to modify the Florida decree: has Florida declined to exercise jurisdiction? Florida has the discretion to decline jurisdiction if it determines that it is an inconvenient forum, and that Utah or some other state's judicial system would be better suited to hear the cause. *See* Fla.Stat. § 61.1316 (1985) (identical to Utah statute). The record establishes, however, that Florida did not decline to assume jurisdiction. Indeed, Florida exercised its jurisdiction by transferring custody of the children temporarily to father, after holding its own hearing. Additionally, the order executed by the Utah court,

which was provided by Florida's Judge Kaney, clearly vested jurisdiction in Florida.

## EMERGENCY JURISDICTION AND THE UCCJA

Father also argues that to provide immediate care and protection to the children in the emergency situation of neglect, the juvenile court appropriately exercised the jurisdiction afforded by section 78–45c–3(1)(c) of the UCCJA. This emergency provision enables a court to modify an out-of-state custody decree if the "child is physically present in this state and ... it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent." *Id.*

■ Emergency jurisdiction under section 78–45c–3(1)(c) is reserved for extraordinary circumstances. *See Coppedge v. Harding*, 714 P.2d 1121, 1129 (Utah 1985) (Stewart, J., dissenting) ("[t]he UCCJA Commissioners intended this provision to have a very limited scope"). The comments to the UCCJA note that this emergency provision

retains and reaffirms *parens patriae* jurisdiction, usually exercised by a juvenile court, which a state must assume when a child is in a situation requiring immediate protection. This jurisdiction exists when a child has been abandoned and in emergency cases of child neglect. Presence of the child in the state is the only prerequisite. This extraordinary jurisdiction is reserved for extraordinary circumstances. *Where there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph.*

7. This is not the typical case outlined by Professor Bodenheimer where the custodial parent moves to a foreign state and petitions the foreign state to modify a custody decree entered by his or her former state, and residence of noncustodial parent. However, it is of no consequence that noncustodial father, rather than custodial mother, filed these proceedings in Utah rather than in Florida where father continued to reside; the UCCJA still precludes Utah

from exercising jurisdiction. *See G.S. v. Ewing*, 786 P.2d 65, 71 (Okla.1990).

8. Where the decree state loses all contact, the analysis begins again with section 78–45c–3 to determine which other state has the closest contacts. *See Kumar*, 186 Cal.Rptr. at 778–79, 652 P.2d at 1009–10; *see also, In re Marriage of Hopson*, 110 Cal.App.3d 884, 168 Cal.Rptr. 345 (1980); *Hache v. Riley*, 186 N.J.Super. 119, 451 A.2d 971, 972–73 (1982).

UCCJA § 3, 9 U.L.A. comment 145 (1988) (citation omitted) (emphasis added).

▮ Emergency jurisdiction should be limited to those cases of neglect where the harm is immediate or imminent. *See, e.g., Brock v. Dist. Court of Boulder County*, 620 P.2d 11, 14–15 (Colo.1980); *Stuart*, 516 So.2d at 1281; *Olivia H. v. John H.*, 130 Misc.2d 756, 497 N.Y.S.2d 838, 840 (Fam. Ct.1986); *Marks v. Marks*, 281 S.C. 316, 315 S.E.2d 158, 162 (Ct.App.1984). Where a grave emergency exists affecting the immediate needs and welfare of the child, a Utah court may enter appropriate orders for the protection of the child present in Utah even if its orders contravene those of a sister state that still retains jurisdiction over custody. *See, e.g., Brock*, 620 P.2d at 14; *Nelson v. Nelson*, 433 So.2d 1015, 1019 (Fla.Ct.App.1983); *Silva v. Tucker*, 500 A.2d 947, 949 (R.I.1985).

We recognize that the emergency provision may lead to attempts at forum shopping based upon fabricated claims of the need to exercise emergency jurisdiction. However, close scrutiny of all such applications and the imposition of sanctions, *see, e.g., Hunt v. Hurst*, 785 P.2d 414, 416 (Utah 1990), and assessing "both parties' costs of litigation against the party whose allegations are ultimately proven to be frivolous" will, hopefully, deter those seeking to circumvent the UCCJA by this provision. *Hache v. Riley*, 186 N.J.Super. 119, 451 A.2d 971, 975 (Ct.Ch.Div.1982); *see also, e.g., In re Marriage of Schwander*, 79 Cal. App.3d 1013, 145 Cal.Rptr. 325 (Dist.Ct. App.1978) (fine imposed against party making frivolous claims of emergency).

Commenting on the scope of jurisdiction that a court should exercise under the emergency provision, Bodenheimer stated:

> [T]his special power [emergency jurisdiction] to take protective measures does not encompass jurisdiction to make permanent custody determinations or to modify the custody decree of a court with continuing jurisdiction. Emergency jurisdiction confers authority to make temporary orders, including temporary custody for a limited period of time, pending proceedings in the state with regular jurisdiction under the Act.

Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA*, 14 Fam.L.Q. 203, 225–26 (1981).

▮ Thus, an assumption of emergency jurisdiction is an assumption of temporary jurisdiction only; it does not confer upon the state the authority to make a permanent custody disposition. *See Iacouzze v. Iacouzze*, 137 Ariz. 605, 672 P.2d 949, 951–52 (Ct.App.1983), *aff'd*, 137 Ariz. 584, 672 P.2d 928 (1983) (en banc); *Brock*, 620 P.2d at 14; *Nussbaumer v. Nussbaumer*, 442 So.2d 1094, 1097 (Fla.Dist.Ct.App.1983); *Umina v. Malbica*, 27 Mass.App.Ct. 351, 538 N.E.2d 53, 58 (1989); *Hache*, 451 A.2d at 975; *Garza v. Harney*, 726 S.W.2d 198, 202–03 (Tex.Ct.App.1987); *see also Rawlings v. Weiner*, 752 P.2d 1327 at 1331 (Utah Ct.App.1988) (Bench, J., concurring) (Washington State took emergency jurisdiction under the UCCJA, but on discovering that Utah, the decree state, had continuing jurisdiction, it correctly declined any further jurisdiction under section 14(1)).

▮ Further, a temporary order should continue only as long as necessary to contact the decree state and determine which court is the correct forum to handle the emergency abuse or neglect claim and to litigate the modification issue. *Curtis v. Curtis*, 789 P.2d 717, 723 (Ct.App.1990); *see also Rawlings*, 752 P.2d at 1330 n. 4. This limited form of temporary relief accommodates "the compelling need to protect a child without emasculating the purposes of the Act." *Nelson*, 433 So.2d at 1019.

In this case, the court had granted father temporary custody based on his ex parte allegations of neglect. The juvenile court appropriately contacted the Florida court by telephone prior to the hearing on temporary custody, *see* Utah Code Ann. § 78–45c–7(4) (1987), but Florida did not relinquish jurisdiction.[9] The juvenile court

---

9. We recommend that where judges communicate by telephone, they make a prompt written record of their conclusions and that the basis for any agreement be set forth clearly in the

erroneously concluded that because it had no indication that Florida was assuming jurisdiction it could exercise jurisdiction. According to the record before us, it appears that Florida, at most, intended for Utah to hold a hearing on the ex parte temporary custody petition under the emergency provisions, and then relinquish all jurisdiction to Florida, which would handle further proceedings concerning both alleged neglect and abuse and modification of its custody order. From at least October 18, 1988, the date of the order relinquishing jurisdiction to Florida, Utah was without jurisdiction to proceed further.

In addition, while the court did find neglect at the August 25 hearing and the October trial, based on father's evidence only, it did not make findings that the neglect was the type of compelling emergency that justifies the extraordinary relief granted by the emergency provision of the UCCJA. *See, e.g., Gribkoff v. Bedford,* 76 Or.App. 695, 711 P.2d 176, 178 (1985) (although there was evidence that the child had been neglected, there was no evidence at the time of the hearing that an emergency existed). Juvenile courts are obligated by Utah R.Civ.P. 52(a), to make findings. *In re R.N.,* 527 P.2d 1356, 1358 (Utah 1974); *In re N.H.B.,* 777 P.2d. 487, 491 (Utah Ct.App.1989). The juvenile court made no finding that an emergency situation existed. Based on the policy that the emergency provision be reserved for extraordinary circumstances where there is an immediate threat of abuse or neglect, we hold that the court's findings are insufficient to justify a change of custody order pursuant to the emergency provisions of section 78–45c–7.

### PKPA

The decision we have reached conforms with comparable provisions in the PKPA. Congress adopted the PKPA to solve the problems that the UCCJA had not successfully addressed. Some states had not adopted the UCCJA at the time Congress considered the PKPA, thereby providing a haven for child snatching parents. Further, confusion among the states that had adopted the UCCJA still resulted in many instances of exercising or asserting concurrent jurisdiction. Note, *The Parental Kidnapping Prevention Act: Application and Interpretation,* 23 J.Fam.L. 419, 420–21 (1984–85).

The PKPA attempts to solve these problems by creating a national standard to be applied in all interstate custody disputes. *See Curtis,* 789 P.2d at 721. The PKPA requires every state to give full faith and credit to child custody determinations made by another state consistent with the provisions of the PKPA. *See Congressional Findings and Declaration of Purposes,* 28 U.S.C.A. § 1738A (West Supp. 1989). Where the PKPA and the state's version of the UCCJA conflict, the PKPA preempts state law. *Curtis,* 789 P.2d at 720 n. 8; *see also In re Marriage of Leyda,* 398 N.W.2d at 819; *In re Custody of Thorensen,* 46 Wash.App. 493, 730 P.2d 1380, 1383 (1987).

In this case, we reach the same resolution under the UCCJA as we would under the PKPA. However, "we recognize the complementary interplay between the UCCJA and the PKPA," *Curtis,* 789 P.2d at 721 n. 9, and the necessity in reaching a resolution under the UCCJA that is consistent with the PKPA. *See Olivia H.,* 497 N.Y.S.2d at 841; *see also Funk v. Macaulay,* 457 N.E.2d 223, 228–30 (Ind.Ct.App. 1983); *Neger v. Neger,* 93 N.J. 15, 459 A.2d 628, 639–40 (1983).

The PKPA uses language more specific than the UCCJA in limiting modification jurisdiction. The language clearly eliminates the possibility of concurrent jurisdiction by conferring exclusive modification jurisdiction upon the state which rendered the initial decree:

(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made

record. *See Redding v. Redding,* 398 Mass. 102, 495 N.E.2d 297, 299 (1986).

consistently with the provisions of this section by a court of another State.

. . . .

(d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child *or of any contestant.*

. . . .

(f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if—

(1) it has jurisdiction to make such a child custody determination; and

(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

28 U.S.C.A. § 1738A (emphasis added).

■ Under these provisions, the initial inquiry is again whether Florida has continuing jurisdiction. In the present case, since one of the contestants, father, was at all times a resident of Florida, Utah lacks jurisdiction under the PKPA to modify the custody decree. *See, e.g., In re Marriage of Leyda,* 398 N.W.2d at 819–20.

■ Emergency jurisdiction under the PKPA requires a more stringent showing than under the UCCJA. The federal statute requires that "it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse." 28 U.S.C.A. § 1738A(c)(1), (c)(2)(C)(ii) (West Supp.1989). Again, there were no findings of an emergency situation of mistreatment or abuse. We conclude, therefore, that the PKPA also precludes the juvenile court from giving either permanent or temporary custody to father.

■ Father responds to mother's assertion that the juvenile court inappropriately assumed jurisdiction under the PKPA by simply contending that the PKPA does not apply to child neglect and dependency hearings. Father cites *State ex rel. W.D. v.*

*Drake,* 770 P.2d 1011 (Utah Ct.App.1989), where this court, relying on *State ex rel. Dep't of Human Servs. v. Avinger,* 104 N.M. 255, 720 P.2d 290, 292 (1986), stated in a footnote that the PKPA does not apply to child neglect and dependency hearings. *Id.* at 1013 n. 1. We recently characterized this statement as "purely dicta in the context of a modification dispute as *Drake* only involved an initial custody determination." *Curtis,* 789 P.2d at 723 n. 12. We rejected the accuracy of the *Drake* dicta "as a general proposition." *Id.*

The New Mexico Supreme Court in *Avinger* concludes that the PKPA does not apply to child neglect and dependency hearings on the basis that the definition of "custody determination" in the UCCJA specifically includes child neglect and dependency proceedings, *see* Utah Code Ann. § 78–45c–2(3) (1987), whereas the comparable definition of the PKPA does not specifically include child neglect and dependency proceedings. *See* 28 U.S.C.A. § 1738A(b)(3). *Avinger* also states that the legislative history of the PKPA limits the statute to "child snatching" across state lines and does not indicate that Congress intended the PKPA to apply to child neglect and dependency proceedings. *Id.* 720 P.2d at 292.

■ We reject *Avinger's* reasoning. Although the PKPA does not expressly refer to neglect and dependency proceedings as part of the definition of custody proceedings, both the statutory language and explicit congressional purposes of the PKPA, mandate application of the PKPA to *any* proceeding in which modification of a foreign custody decree is at issue, regardless of how those proceedings are defined by a state. *Avinger,* 720 P.2d at 296 (Walters, J., concurring in part, dissenting in part). The PKPA's coverage of custody proceedings is exclusive: "[t]he appropriate authorities of every State shall enforce . . . and shall not modify . . . *any child custody determination* made . . . by a court of another State." 28 U.S.C.A. § 1738A(a) (West Supp.1989) (emphasis added). Where the statute is unambiguous, it is impermissible to examine legisla-

**130**

tive history as an aid in determining the intent of Congress. *See Johnson v. Utah State Retirement Bd.*, 770 P.2d 93, 95 (Utah 1988). Further, holding that the PKPA does not apply to neglect and dependency proceedings would allow a forum-shopping parent to avoid the PKPA by simply transporting a child to another state and alleging that the other parent has neglected the child. Such a result would be inconsistent with the purposes of the PKPA. Thus, we determine that the PKPA is applicable to all interstate custody proceedings affecting a prior custody award by a different state, including neglect and dependency proceedings. *See Olivia H.*, 497 N.Y.S.2d at 841.

### CONCLUSION

By the time of the October trial, the Utah juvenile court lacked jurisdiction under either the UCCJA or the PKPA to permanently award custody to father as either a modification of the divorce decree or a determination of neglect or dependency.

We conclude that the juvenile court lacked jurisdiction to permanently modify Florida's custody decree by awarding custody to father and improperly granted temporary custody to father. Our decision is consistent with the policy and purposes of both the UCCJA and the PKPA. Because of the disposition, we do not address the remaining issues raised by mother.

Reversed.

BENCH and BILLINGS, JJ., concur.